Filed 10/21/25  In re K.T. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.T., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E086352 |
| Plaintiff and Respondent, | (Super.Ct.No. J297551) |
| v. | OPINION |
| J.T., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn Poncin, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

1

J.T. (Father) appeals from the order terminating parental rights to his daughter, K.T. Father argues that San Bernardino County Children and Family Services (CFS) did not sufficiently report on "the amount" and "nature of any contact between the child" and Father. (Welf. & Inst. Code, § 366.21, subd. (i)(1)(B); unlabeled statutory citations refer to this code.) He contends that he would have proved the beneficial parental relationship exception to adoption if CFS had adequately reported on his contact with his daughter. We affirm.

BACKGROUND

I. *Detention*

CFS received a referral in June 2023 alleging that Vivian W. (Mother) tested positive for marijuana at K.T.'s birth. (Mother is not a party to this appeal.) K.T. also tested positive for marijuana. Mother reportedly had a history of using amphetamine, cocaine, and ecstasy. She told the social worker that she used marijuana during her pregnancy but denied using any other drugs. Mother had a dependency history with two other children; the court terminated her parental rights to those children in 2020 and 2022.

Father said that he occasionally used marijuana. The referral also alleged that Father was exhibiting "aggressive behavior" and that the parents may be involved in domestic violence. The parents were arguing loudly, and Father had been escorted out of the hospital and was barred from reentering. Father acknowledged that he had a domestic violence incident with a former partner but denied any domestic violence with Mother.

2

CFS filed a petition under section 300, subdivisions (b)(1) and (j), alleging that (1) Mother and Father had substance abuse problems that impaired their ability to provide adequate care for K.T., (2) Father knew or should have known that Mother was using substances during her pregnancy, and (3) K.T.'s half siblings had been abused or neglected by Mother, and K.T. was at substantial risk of the same.

The juvenile court detained newborn K.T. from both parents and ordered weekly supervised visitation for two hours. The court ordered CFS to provide predisposition services. K.T. was placed with a foster family.

II.    *Jurisdiction and disposition*

In preparation for the jurisdiction and disposition hearings, Father reported that he and Mother had broken up because they argued about little things, but he again denied that they engaged in domestic violence. He had a 2016 misdemeanor conviction for inflicting corporal injury on a spouse or cohabitant. (Pen. Code, § 273.5, subdivision (a).) Father disclosed that he had a nine-year-old son with another woman, and a social worker spoke with that mother. The mother reported that she had no contact with Father. He had physically abused her when she was pregnant with their son. As a result, she was hospitalized, and their son was born prematurely.

Mother confirmed that she and Father had recently broken up, and she said that Father was physically abusive, including while she was pregnant. She also reported that they smoked marijuana together. Father said that he did not smoke often, and he had last done it one or two months ago.

CFS filed an amended petition and added allegations that the parents engaged in domestic violence, placing K.T. at substantial risk of harm.

Father reported that his visits with K.T. were going "fine" and that he wanted more visitation. He failed to appear for two drug tests, tested negative once, and had results pending for one more test. There was conflicting evidence about a fifth test. Father said that he attempted to test, and he provided a letter from the clinic stating that he appeared for a test "but was not on the list." But the list of test results from the lab stated that he was a "no show" on that same date. (Capitalization omitted.)

The contested jurisdiction and disposition hearings occurred in August 2023. The court found true the allegations against both parents. The court declared K.T. a dependent and removed her from both parents' custody. The court ordered reunification services for Father but denied Mother reunification services under section 361.5, subdivision (b)(10) and (b)(11). The court again ordered supervised weekly visitation for two hours.

III.   *Six-month review period*

K.T. had been with the same foster family since June 2023. She was bonding with the caregivers and appeared very relaxed and comfortable in the caregivers' arms. Father completed a 12-week domestic violence class and a 16-session parenting class. He was evaluated for drug and alcohol treatment, but the evaluator determined that he did not meet the criteria for substance abuse disorder treatment. He drug tested negative five times and failed to appear for one test. (He failed to appear for a second test, but the social worker attributed that to her belated communication with Father after she

4

submitted a new referral for drug testing.) Father had been consistently visiting K.T. and wanted to move to unsupervised and overnight visits. CFS's six-month review report recommended that he have unsupervised and overnight visits with the goal of returning K.T. to his home.

The court continued the six-month review hearing but ordered that Father have unsupervised weekly visits for four hours. CFS received a report from Father's therapist before the continued hearing. Father told the therapist that he did not have a history of domestic violence. He had completed eight sessions with the therapist, and she was requesting another four sessions to address his failure to take responsibility for domestic violence in his relationships. Her "prognosis for remediation of referring problems" was "[g]uarded." Father was upset by the therapist's report, felt that he was "'being judged,'" and did not understand why he needed to continue drug testing.

At the continued hearing in February 2024, the court continued Father's reunification services and ordered unsupervised visitation at least twice per week for two hours.

IV.    *Twelve-month review period*

In May 2024, Father's therapist terminated her sessions with him for lack of attendance. Father failed to appear for nine drug tests and tested negative once. Mother reported that Father had been "'harassing her,'" hit her, and threatened her with a knife.

Father was having four-hour visits with K.T. twice per week. K.T.'s caregivers reported that the visits with Father had been going well and that the child returned from visits happy and smiling.

CFS's 12-month review report recommended that the court terminate Father's reunification services. K.T.'s caregivers stated that they loved the child and wanted to adopt her if reunification failed.

The court continued the 12-month review hearing and ordered that Father's visits be supervised again. Father tested positive for marijuana once and tested negative twice. CFS submitted a new referral for counseling, and Father attended three sessions. His new therapist reported that he continued to struggle with taking responsibility for his actions and his role in the events that led to K.T.'s removal. Father did not understand why he had to continue doing therapy.

Father testified at the continued review hearing in August 2024. He said that Mother's account of his recent behavior was untrue and that there had been no domestic violence between them since this case began. He also testified that all of his drug test results were negative. He missed a number of drug tests because he lost his grandmother. Father had 30 to 40 unsupervised visits with K.T. He wanted the court to order overnight visits and continue reunification services.

The court terminated Father's reunification services and set the matter for a selection and implementation hearing under section 366.26. The court also reduced his supervised visits to twice per month for two hours.

V.    *Section 366.26 hearing*

In September 2024, K.T. was placed in the home of a paternal relative but then returned to her foster family placement in January 2025. The foster caregivers reported that K.T. "remembered her old room and appeared happy and comfortable," "like she

never left." The child was particularly bonded to the foster father. She was readjusting well in the home, and the caregivers still wanted to adopt her. They loved K.T. and were "extremely happy" to have her in their home, even if the placement was not permanent.

According to the section 366.26 report, Father's bimonthly visits were "consistent and appropriate." K.T. was healthy and on track developmentally, and there were no concerns about her mental or emotional health. The caregiver described her as "very smart" and "very outgoing." CFS asked the court to continue the section 366.26 hearing for 90 days, because the agency needed more time to complete the adoption assessment. The court granted the continuance.

CFS's addendum report recommended that the court terminate parental rights and select a permanent plan of adoption. The agency observed that K.T. had been placed with the caregivers for most of her life, they had developed a mutual bond, and the caregivers were committed to adoption.

The continued section 366.26 hearing occurred in June 2025. Father did not set the matter for contest. His counsel objected to termination of parental rights and argued: "[Father] has always consistently visited with his child. The visits are consistently good, and I would say even beneficial to the child. At one point he was able to have unsupervised visits. Those went well as long as they lasted, and since that time, he has visited pretty much every opportunity he's had. [¶] We would ask the Court to consider legal guardianship in lieu of adoption . . . ." Mother did not object to CFS's recommendation and "submit[ted] to termination of parental rights."

The court declined to apply the beneficial parental relationship exception to adoption. The court explained the elements of the exception under *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) and concluded that Father had regular visitation and contact with K.T. But there was "no evidence presented that there is a relationship between [K.T.] and her father that the continuation would benefit [her] to such a degree that termination of parental rights would be detrimental to the child." The court further reasoned that there were no "exceptional circumstances to allow the Court to deviate from the legislative preference for adoption." It therefore terminated parental rights and selected adoption as K.T.'s permanent plan.

## DISCUSSION

Father argues that CFS inadequately reported on the amount and nature of his contact with K.T. He contends that if the agency had adequately reported, then he could have proven that the beneficial parental relationship exception to adoption applied. We conclude that Father forfeited his challenge to CFS's report. In any event, Father has not shown that he was prejudiced by the claimed deficiency in the report.

At the section 366.26 hearing, if the juvenile court finds that the dependent child is likely to be adopted, then the court must terminate parental rights and select adoption as the permanent plan unless it finds that adoption would be detrimental to the child under one of several exceptions. (§ 366.26, subd. (c)(1); *Caden C.*, *supra*, 11 Cal.5th at pp. 630-631.) The exceptions "'permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C.*, at p. 631.)

Under the beneficial parental relationship exception, the parent has the burden of proving three elements by a preponderance of the evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) First, the "parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted." (*Ibid.*) Second, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Ibid.*) Third, "the parent must show that terminating" parental rights "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Ibid.*)

When the juvenile court sets a selection and implementation hearing under section 366.26, the court must direct the child welfare agency to prepare an adoption assessment report. (§ 366.21, subd. (*i*)(1).) The assessment shall include, among other things, "a review of the amount of and nature of any contact between the child and their parents . . . since the time of placement." (§ 366.21, subd. (*i*)(1)(B).)

Father forfeited his challenge to the adequacy of the adoption assessment report by failing to raise the issue in the juvenile court. A party may forfeit the argument that the agency's report does not comply with statutory requirements. (*In re Brian P.* (2002) 99 Cal.App.4th 616, 623.) In particular, the argument that the assessment does not adequately report on the amount and nature of any contact between the child and family members is forfeited if not raised in the juvenile court. (*In re Urayna L.* (1999) 75 Cal.App.4th 883, 886 (*Urayna L.*).) "[A]ny other rule would permit a party to trifle with the courts by standing silently by, thus permitting the proceedings to reach a conclusion

9

in which the party could acquiesce if favorable and avoid if unfavorable." (*Ibid.*) Moreover, that objection to the report "is just the kind of issue which should be developed by putting on one's own evidence or cross-examining the person who prepared the report." (*Id.* at p. 887.)

Father argues that he has not forfeited his challenge to the adequacy of the report, or that we should exercise our discretion to decide the forfeited issue, because CFS acknowledged its deficient reporting and therefore should not be surprised by his challenge. But CFS merely asked for a continuance to complete the adoption assessment report. The agency never conceded that its subsequent assessment inadequately reported on Father's contacts with the child.

Father also argues that we should consider the forfeited issue because other appellate courts have held that deficiencies in the adoption assessment report undermined the decision to select adoption as the child's permanent plan. (E.g., *In re Valerie W.* (2008) 162 Cal.App.4th 1, 15; *In re B.D.* (2019) 35 Cal.App.5th 803, 821-824.) Those cases do not assist Father. They concern the court's finding that a child is likely to be adopted. To terminate parental rights and order adoption as the permanent plan, the juvenile court must find by clear and convincing evidence that it is likely that the child will be adopted. (§ 366.26, subd. (c)(1).) The child welfare agency has the burden of proving that the child is adoptable. (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561.) "The question of adoptability usually focuses on whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child." (*In re Valerie W.*, at p. 13.) In the case on which Father primarily relies, the court

10

held that the record did not contain substantial evidence to support the adoptability finding, because the agency did not adequately report on several issues that were critical to the adoptability determination. (*Id.* at pp. 14-15.)

But Father is not bringing a substantial evidence challenge to a finding that the court was required to make in order to terminate his parental rights. Rather, he is challenging the court's determination that he failed to carry his burden of proof on the second and third elements of an exception to the termination of parental rights. The court concluded that there was "no evidence presented" that he had a beneficial relationship with K.T. such that termination of parental rights would be detrimental. Father had the burden of proof, and CFS was not required to disprove the exception. (*In re J.D.* (2021) 70 Cal.App.5th 833, 861.) If Father believed that CFS's report on his contacts with K.T. was inadequate, then he should have objected to the report on that basis. More importantly, he could have offered evidence regarding his visits, any bond with K.T., and any detriment to her from severing parental rights. (*Urayna L.*, *supra*, 75 Cal.App.4th at p. 886.) But he did not call the social worker who wrote the adoption assessment report to cross-examine her. He did not call the caregivers to testify about their observations when supervising visits or about K.T.'s behavior after visits. He did not offer his own testimony about his visits with K.T. He did not even set the matter for contest. Father forfeited his challenge to the adequacy of CFS's report, and the authorities on which he relies do not support a contrary conclusion.

Even if Father had not forfeited the challenge, we would conclude that he fails to show that the claimed error prejudiced him. (Capitalization and boldface omitted.) He

claims that CFS violated state law (§ 366.21, subd. (*i*)(1)(B)) by inadequately reporting on his contacts with K.T. He therefore must show a reasonable probability that he would have proven the beneficial parental relationship exception absent the violation. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Father has not made that showing.

When a court assesses whether the child would benefit from continuing their relationship with the parents, "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

In "assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 632, citing *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The parent must show that their relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.*, at p. 575.) "A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646, disapproved on other grounds by *Caden C.*, at pp. 637-638, fns. 6, 7.)

Overall, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the

12

child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; accord, *Caden C.*, *supra*, 11 Cal.5th at p. 633.)

Even if CFS had reported more thoroughly on Father's contacts with K.T., there is no reasonable probability that Father would have shown such a substantial, positive emotional attachment to Father that the harm in severing the parental relationship would outweigh the benefits of adoption. K.T. was detained from the parents as a newborn in June 2023. By the time of the section 366.26 hearing in June 2025, she was two years old. She had spent her entire life out of Father's care, and she had spent all but four months of her life with the foster family who wanted to adopt her. The caregivers loved her, and she was bonded to them. K.T. was healthy and happy in their care. Regardless of whether her visits with Father were loving and pleasant, there is no evidence that K.T.'s bond with him was so strong as to outweigh the sense of security and stability that the adoptive home would confer. (See *In re C.F.* (2011) 193 Cal.App.4th 549, 555 ["A parent must show more than frequent and loving contact or pleasant visits"].) For example, there is no evidence that K.T. had any difficulty separating from Father when his visits ended or that she suffered any negative emotional consequences when his visits were reduced after his reunification services were terminated. And as already explained, CFS's report was not the only possible source of information about the child's contact with Father. Father had many avenues for offering evidence of any bond with the child and any harm to her from severing their relationship, and he failed to offer any. The

13

reasonable inference is that no such evidence existed. On this record, Father has not shown prejudice from the claimed inadequacy of CFS's report.

For all of these reasons, we conclude that Father forfeited his challenge to CFS's report. Moreover, assuming that he did not forfeit the claim of error, he fails to demonstrate prejudice.

## DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

McKINSTER
Acting P. J.

MILLER
J.

14